**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.: MJM-26-0274** |
| | * | |
| **SHAWN HEARN,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**…oOo…**

## GOVERNMENT'S DETENTION MEMORANDUM

The United States of America, by and through its undersigned attorneys, submits this Detention Memorandum in advance of defendant Shawn Hearn's detention hearing scheduled for Thursday, September 24, 2026, at 1:30 p.m.

### Introduction

The Court should detain defendant Hearn pending trial. Defendant Hearn is charged in the Indictment with: (1) Conspiracy to Distribute and Possess with Intent to Distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count One); and (2) Possession with Intent to Distribute five kilograms or more of cocaine and 400 grams or more of fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) (Count Five) . ECF no. 29. During the investigation into Hearn, investigators learned that Hearn was a customer of the Robinson Drug Trafficking Organization ("Robinson DTO"), a large-scale DTO that trafficked massive amounts of cocaine throughout the Baltimore metropolitan area and beyond. The Robinson DTO obtained its cocaine from a source of supply in Mexico. The drugs were usually transported and concealed in steel structures packed in wooded crates loaded onto flatbed tractor trailers. The loads of cocaine were delivered to one

of many warehouses utilized by the Robinson DTO, where the drugs were unloaded and then distributed to the Robinson DTO's customers, including Hearn.

In May 2026, federal law enforcement agents executed more than two dozen search and seizure warrants for members, residences, and vehicles associated with the Robinson DTO. During execution of the search warrants in early May 2026, law enforcement agents seized large amounts of cocaine (approximately 58 kilograms of cocaine);[1] approximately twelve kilograms of fentanyl;[2] approximately $1.6 million in U.S. currency; and small amounts of other controlled substances. As to Hearn specifically, on May 6, 2026, law enforcement agents seized approximately ten kilograms of cocaine, approximately one kilogram of fentanyl, and approximately $205,000 in U.S. currency from Hearn's residence located at 2516 Oakley Road in Baltimore. Importantly, Hearn was on federal supervised release at time of his involvement with the Robinson DTO.

Given the seriousness of the offense and Hearn's extensive involvement with the Robinson DTO, his lengthy criminal history that includes two prior federal convictions for drug trafficking, and his drug trafficking while on supervised release, it is apparent that no condition or combination of conditions will reasonably assure the safety of the community or his appearance at future court proceedings.

**<u>Factual and Procedural Background</u>**

In September/October 2025, agents of the Drug Enforcement Administration ("DEA") initiated an investigation into the Robinson DTO. During the investigation into the Robinson

[1] An additional 83 kilograms of cocaine were seized from the Robinson DTO in November 2025, as discussed below.

[2] Twelve kilograms of fentanyl contain enough lethal doses to kill the majority of the population of State of Maryland.

DTO, agents learned from multiple confidential sources that Robinson was a well-known, large-scale drug supplier in Baltimore, Maryland. The CSs estimated that Robinson obtained between 50 to 150 kilograms of cocaine at a time. Once source provided that Robinson also obtained and distributed heroin and/or fentanyl.

During the investigation into the Robinson DTO, investigators learned that Robinson received large shipments of drugs that were concealed inside steel structures packed in crates loaded on flatbed trailers and delivered to him at his warehouses located in and around Baltimore: the Evergreen Street warehouse, the Commerce Drive warehouse, and the Kirk Avenue warehouse. Robinson then unloaded the drugs and concealed them inside his warehouses. The drugs were then distributed to his customers, such as Hearn, co-defendant Shane Green, and co-defendant Cori Grant. Robinson then collected drug proceeds (U.S. currency) and packed the money inside the crates/steel structures, loaded them onto flatbed trailers, then shipped the money to his source of supply of drugs.

During the investigation, the Robinson DTO received numerous shipments of drugs at Robinson's warehouses. Specifically, shipments of suspected narcotics were received by the Robinson DTO on the following dates:

- October 27, 2025
- November 13, 2025
- January 2, 2026
- February 3, 2026
- April 10, 2026
- May 4, 2026

The shipments of drugs usually arrived on flatbead trailers, concealed in steel structures as depicted below:



*Delivery of drugs to the Robinson DTO in October 2025*




*Delivery of drugs to the Robinson DTO in January 2026*




*Delivery of drugs to the Robinson DTO in February 2026*




*Delivery of drugs to the Robinson DTO in April 2026*

*<u>Investigation into the Robinson DTO and Hearn</u>*

While investigating the Robinson DTO, law enforcement agents identified Hearn as a significant member and large drug customer of the Robinson DTO. When the large, kilogram-quantity shipments of cocaine arrived in Baltimore at the Robinson DTO's warehouses, Hearn quickly appeared at the warehouses to received large, kilogram-quantities of drugs from the Robinson DTO.

For example, following the arrival of the shipment of drugs at the Robinson DTO's Evergreen Street warehouse in early November 2025, Hearn and co-defendant Green arrived at the Evergreen Street warehouse the day after the shipment of drigs arrived at the warehouse. Hearn drove a Dodge Durango SUV and Green drove a Ford Edge SUV. Green removed a large trash bag from the front passenger side of his vehicle and placed it into Robinson's KIA. Green then left the warehouse. Robinson moved his KIA vehicle and parked directly next to Hearn's vehicle. Robinson then removed the weighted trash bag from the rear of his KIA vehicle and placed the bag in the rear of the Durango. Hearn then handed Robinson a red bag which Robinson placed in his KIA. Hearn then left the warehouse. The sequence of events is captured in the photos below:








*Activity at the Evergreen Street warehouse on November 7, 2025*

On November 13, 2025, another tractor trailer delivered 16 wooden crates with yellow structures inside of them to the Evergreen Street warehouse:



*Shipment of drugs at the Evergreen Street warehouse on November 13, 2025*

On November 20, 2025, Robinson left his apartment in Towson, Maryland, stopped briefly in Baltimore, and traveled to BWI airport. While at BWI airport, Robinson picked up an individual. From there, Robinson drove to his warehouse located on Commerce Drive. At the warehouse, Robinson carried numerous weighted bags into the warehouse, accompanied by his worker and the other man. Robinson and his worker then left the warehouse with an oxygen tank, commonly used for welding. Robinson and his worker went to a business that sells welding gases and supplies. They returned to the warehouse after this short trip, leading investigators to believe they had gone to refill the welding tank used to cut open the steel structures containing drugs.

At approximately 2:09 p.m. on November 20th, Robinson was observed at his warehouse on Evergreen Street in Baltimore City. Investigators observed Robinson's worker and another

individual peaking around the corner of the warehouse, wearing gloves, as if monitoring the front gate entrance. At approximately 2:27 p.m., they locked the front door of the warehouse and pulled on the door to ensure it was locked. Minutes later, co-defendant Angela Pugh-Smith arrived at the warehouse, driving a white Ford pick-up truck, bearing Ohio license tags. Pugh-Smith parked in the rear of the Evergreen Street warehouse. Less than an hour later, the pick-up truck pulled out of the warehouse and left the location, followed by investigators.

Suspecting the truck was carrying drugs and/or drug proceeds, investigators coordinated with the Washington County, Maryland Sheriff's Office ("WCSO") to conduct a traffic stop of the pick-up truck operated by Pugh-Smith while it traveled westbound on Interstate 70. During the stop, a WCSO K-9 unit alerted for the presence of narcotics. During the traffic stop, a concealed compartment, or "trap," was found under the bed of the pick-up truck. The pick-up truck was towed, and a search warrant was obtained the following day. A search of the concealed compartment/trap resulted in the seizure of approximately 83 kilograms of suspected cocaine, each packaged with a distinctive logo and heavily coated in grease.






After the pick-up truck left the Evergreen Street warehouse, Robinson, his worker, and the other individual returned to the Commerce Street warehouse and remained there until after midnight. During that time, agents believe the three men were packaging drug proceeds into the yellow crates/steel structures while they were inside the Commerce Street warehouse.

On November 25, 2025, a flatbed trailer arrived at the Commerce Drive warehouse and all 16 crates/steel structures were loaded on the trailer and hauled away.




*Tractor trailer loaded with drug proceeds preparing for departure on November 25, 2025*

On January 2, 2026, a tractor trailer with a flatbed arrived and parked at the Robinson DTO's warehouse located on Commerce Drive in Halethorpe, Maryland. The flatbed carried approximately 16 wooden crates that appeared to have metal/steel structures inside of them.[3] Robinson and his unidentified worker unloaded all the crates using a forklift and moved them to the rear of the warehouse through the roll-up door.

The following day, January 3, 2026, Robinson and his worker returned to the Commerce Drive warehouse. Later that morning, Hearn arrived at the rear of the warehouse operating the Durango vehicle. At the warehouse, Robinson and Hearn met at the south end of the warehouse in their vehicles but out of view of surveillance cameras. The vehicles reappeared a few minutes later and Hearn left the warehouse.



[3] The wooden crates observed on January 2, 2026, appeared similar, if not identical, to the crates observed by investigators in late October 2025, and mid-November 2025.



*Robinson and Hearn at the Evergreen Street warehouse on Janaury 3, 2026*

Following the meeting with Robinson, Hearn drove directly to his residence located at 2516 Oakley Avenue, Baltimore, Maryland 21215.

On February 3, 2026, another shipment of drugs was delivered to the Commerce Drive warehouse utilized by the Robinson DTO. On February 4, 2026, investigators saw Robinson arrive at the warehouse in one of his vehicles. Robinson's worker exited the vehicle and entered the warehouse via the front door as Robinson drove to the back of the building. Robinson then backed his vehicle to the rear door of the warehouse. Robinson and his worker proceeded to load three heavy trash bags into the rear passenger compartment area of the vehicle. The two men then departed the warehouse.



After leaving the Commerce Drive warehouse, Robinson met Hearn on Evergreen Street.

Hearn retreived a weighted bag from Robinson's KIA and placed the bag into his Durango vehicle. Hearn then left Evergreen Street and went to his residence located on Oakley Avenue. Hearn entere the front door of the residence carrying the weighted bag.



*Robinson and Hearn on Evergreen Street on February 4, 2026*



*Hearn entering 2516 Oakley Avenue with weighted trash bag on February 4, 2026*

On April 10, 2026, the Robinson DTO received another large shipment of drugs concealed in crates/streel structures. The shipment was delivered to a third warehouse associated with the Robinson DTO, located on Kirk Avenue in Baltimore. Robinson and his worker unloaded the drugs, packed on pallets, into a box truck owned by Robinson. Robinson then drove the truck to his Commerce Drive warehouse. Robinson and his worker then moved the drugs from the boxtruck into the warehouse using a forklift.

Later that day, Robinson moved his gray Hyundai vehicle to the rear of the Commerce Drive warehouse and loaded three weighted black bags into the vehicle. Investigators noticed that the items inside the bags appeared to be rectangular and consistent with kilogram packaging of drugs. Robinson then left the warehouse and met Hearn at the rear of a property owned by Robinson located at 3505 Wabash Avenue in Baltimore City. At the location, Hearn retrieved a weighted black bag from Robinson and placed it into his Durango vehicle. Hearn then left the location and drove directly to his residence located on Oakley Avenue. Hearn carried the bag into the residence, as depicted below:



On May 4, 2026, the Robinson DTO obtained a new supply of drugs at the Kirk Avenue warehouse. The drugs were moved by Robinson to his warehouse located on Commerce Drive. That same night, Robinson gave a black bag of suspected drugs to Hearn. Hearn the took the drugs to his stash house located on Oakley Road. That same day, federal agents obtained 27 federal search and seizure warrants were for persons, residences, and vehicles involved with the Robinson DTO.[4]

On May 6, 2026, Hearn's residence located at 2516 Oakley Avenue was search pursuant to a federal search and seizure warrant. Inside of the residence, agents located and seized approximately ten kilograms of cocaine; a kilogram of fentanyl; and approximately $205,000 in U.S. currency.

During the investigation, investigators seized from the Robinson DTO more than 140 kilograms of cocaine; approximately twelve kilograms of fentanyl (enough to kill a significant portion of the population in Maryland); smaller amounts of a variety drugs (including methamphetamine); approximately $1.5 million in U.S. currency; firearms; drug packing paraphernalia; and dozens of cellular devices.

**Argument**

When there is probable cause to believe that a defendant committed an offense under the Controlled Substances Act that carries a maximum sentence of 10 years or more of imprisonment, "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(A). That presumption is subject to rebuttal by the defendant, which is a "limited burden of production"

[4] United States District Court for the District of Maryland, matter nos. 1:26-mj-01070-CJC through 1:26-mj-01096-CJC.

for the defendant to show he does not pose a risk of flight or danger to the community. *United States v. Weddington*, Crim. No. RDB-19-597, 2020 WL 4569524, *2 (D. Md. Aug. 7, 2020) (quoting *United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018). However, the presumption in favor of detention is not eliminated once the defendant meets the burden of production; it becomes a factor to be considered in evaluating whether to detain the defendant. *Id.*

When seeking detention based on community safety or risk of flight, the government's burden is to demonstrate the risk posed by the defendant by clear and convincing evidence. 18 U.S.C. § 1342(f)(2). When seeking a detention order, the government may proceed by proffer of evidence. *See United States v. White*, Crim. No. PWG-13-436, 2015 WL 2374229, *2 (D. Md. May 15, 2015). In determining whether detention is warranted, 18 U.S.C. § 3142(g) directs a court to consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to the community that would be posed by the defendant's release.

Here, each of the Section 3142(g) factors weigh in favor of detention. There is clear and convincing evidence that no condition or combination of conditions can assure the safety of the community or assure Hearn's presence at future court proceedings.

<u>Nature and Circumstances of the Offense</u>

In the Indictment, Hearn is charged with serious drug offenses that carry significant penalties. The two counts to which Hearn is charged carry mandatory minimum sentences of ten years' imprisonment up to a maximum sentence of life imprisonment. The specific circumstances of the conduct underlying the offenses heighten their seriousness. In sum, Hearn was a major customer of one of the largest drug trafficking organizations operating in Baltimore. Over the

course of the conspiracy, the Robinson DTO trafficked and distributed hundreds of kilograms of cocaine in around the Baltimore metropolitan area. The DTO not only sold drugs directly to customers for individual use, but also in larger distribution-level quantities to other potential sellers who could then go on to further distribute drugs in Maryland and beyond. Hearn played a significant role in the distribution of large quantities of cocaine purchased from the Robinson DTO.

Importantly, the nature of the offenses is serious enough that it creates a presumption in favor of detention. 18 U.S.C. § 3142(e)(3)(A). Even if Hearn could meet his burden to produce any evidence suggesting he may not be a danger to the community, that presumption remains a factor. Overall, the seriousness of the charged offenses weighs in favor of detention.

<u>Weight of the Evidence</u>

The government's evidence is strong. During the investigation, regular and sometimes daily surveillance by law enforcement agents captured Hearn and the Robinson DTO's movements and drug trafficking activities. Through covert surveillance methods, law enforcement agents were able to track and monitor the movements of Robinson, Hearn, Green, Grant, and other members of the DTO during the investigation. During the investigation, Hearn met with Robinson immediately following the deliveries of drug shipments to the DTO. Investigators estimate that Hearn obtained large, kilogram quantities of cocaine from Robinson following the six deliveries of drugs between October 2025, and May 2026. On May 6th, law enforcement agents seized ten kilograms of cocaine, one kilogram of fentanyl, and approximately $205,000 in U.S. currency from Hearn's residence. In addition to Hearn's drugs, 38 kilograms of cocaine were seized from co-defendant Grant following an exchange from Robinson to Green, and then from Green to Grant, on May 5, 2026. An additional four kilograms of cocaine were seized from Grant's apartment. Six kilograms of cocaine were seized from the Commerce Drive warehouse. Robinson's

laundromat on Walbrook Avenue contained approximately $769,000 in U.S. currency, as well as approximately eight kilograms of fentanyl and a firearm. Approximately $314,000 in U.S. currency was seized from Robinson's residence located on King William Drive. The cumulative evidence against Hearn and the other members of the DTO is significant, if not overwhelming, and demonstrates clearly that Hearn was a significant purchaser and distributor of cocaine in the Baltimore metropolitan area. This factor strongly weighs in favor of detention.

<u>History and Characteristics of the Defendant</u>

Hearn has a significant criminal record for drug trafficking:

- In *U.S. v. Shawn Hearn, et al.*, criminal no. WDQ-00-0185, Hearn was convicted of Possession with Intent to Distribute 500 grams of more of Cocaine and received a sentence of 110 months' imprisonment, followed by four years of supervised release; and
- In *United States v. Hearn, et al*., criminal no. JRR-15-0033, Hearn was convicted of Possession with Intent to Distribute Heroin and received a sentence of 151 months' imprisonment, followed by three years of supervised release. Hearn's term of supervised release commenced on November 8, 2023, and he was under supervision while he engaged in the drug-trafficking alleged in the Indictment.

Moreover, Hearn used his residence, where his parents also reside, as his stash house for drugs and money.

In June 2026, Hearn's probation officer moved for early termination of supervised release. It is clear from the USPO's request to the Court that Hearn failed to report to the USPO that his

residence was searched pursuant to a federal search and seizure warrant on May 6, 2026, and that large quantities of cocaine, fentanyl, and cash were seized.

Hearn's conduct in this case paints a clear picture of drug trafficking as his only source of income, as well as his failure to rehabilitate and reform himself following two significant terms of federal imprisonment. Based on these events, Hearn's history and characteristics factor alone weighs strongly in favor of detention.

Nature and Seriousness of the Danger to Any Person or the Community

The drugs received by and dispensed by the Robinson DTO present a serious and significant danger to the community. The risks associated with cocaine and fentanyl are well known to this Court. Based on the evidence gathered throughout the investigation, the controlled substances seized in May 2026 (large quantities of cocaine, fentanyl, etc.) represent just a fraction of the Robinson DTO's regular business of trafficking and distributing colossal amounts of drugs in the Baltimore metropolitan area and beyond. Moreover, fentanyl is one of the most lethal drugs available on the streets, and a kilogram of fentanyl was seized from Hearn's Oakley Avenue residence – enough lethal doses to kill 500,000 Marylanders. There is no doubt that Hearn's conduct caused significant damage to the Baltimore community that is common to drug trafficking, including violence that is always present at the street level. The distribution of cocaine and fentanyl are inherently linked to the violence that is associated with street-level drug-dealing, and the Robinson DTO was a major supplier and source of those drugs to the lower-level drug consumers. In addition, the lethality of fentanyl is undisputable, and the number of lives affected by these drugs is immeasurable. Thus, the danger Hearn poses to the community is clear and weighs in favor of detention.

In short, evaluation of all the Section 3142(g) factors shows, by clear and convincing evidence, that the defendant George Robinson should be detained pending trial.

**Conclusion**

For the reasons stated above, and for any others presented at the detention hearing, there is no condition or combination of conditions that would reasonably assure the safety to the community or Robinson's appearance for court proceedings. Accordingly, defendant Shawn Hearn should be detained pending trial.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

John W. Sippel, Jr.
Assistant United States Attorney
36 S. Charles Street, Fourth Floor
Baltimore, Maryland 21201
(410) 209-4807

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing Government's Detention Memorandum was served via the ECF filing system and by email to:

Christopher J. Purpura, Esquire
8 E. Mulberry Street
Baltimore, Maryland 21202

John W. Sippel, Jr.
Assistant United States Attorney